**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**MOISES HUMBERTO RIVERA-LUNA**<br>Defendant. | **Case No. 10-cr-256 (RCL)** |

**DEFENDANT MOISES HUMBERTO RIVERA-LUNA'S MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY BY JUAN DIAZ**

Defendant Moises Humberto Rivera-Luna, through undersigned counsel, respectfully moves in limine to exclude the proposed expert testimony of Juan Diaz. Rivera-Luna does not seek through this motion to prevent Diaz from recounting otherwise admissible facts within his personal perception. He seeks to prevent the Government from conferring expert status on the single fact witness whose credibility is central to its disputed identification of Rivera-Luna as "Viejo Santos."

## I. INTRODUCTION

The Government proposes to place two different witnesses inside one person. As a fact witness, Diaz is the only law-enforcement witness who claims that he personally met Rivera-Luna in a Salvadoran prison and heard him identify himself as "Viejo Santos." As a proposed expert, Diaz would draw upon twenty-five years of Salvadoran police work to describe MS-13's structure, rules, leadership, tattoos, prison practices, and transnational operation. Those subjects are not separate in this case. They are the very subjects the Government uses to transform Diaz's disputed memory into its identification and leadership theory.

That proposed presentation creates precisely the danger identified by the D.C. Circuit: when a "two-hatted" witness gives closely related lay and expert opinion testimony, interspersing those roles may require "mental gymnastics" by jurors and risk confusion about whether the witness is testifying from personal perception or expert authority. *United States v. Williams*, 827

F.3d 1134, 1160 (D.C. Cir. 2016). Here, the problem goes further. The expert designation would place an official seal of reliability on the Government's most contested identification witness. The two Rivera-Luna trials show why exclusion is necessary. Diaz's personal account concerns two or three unrecorded encounters of approximately fifteen to twenty minutes in 2013 and 2014, or possibly 2015. No contemporaneous report has been produced. Diaz testified that reports were prepared but may have been destroyed during police-unit changes and could not be found. His testimony about earlier identifications rested on unnamed prisoners, a deceased source, unidentified custodial employees, photographs, and information he said police had already used to "identify" Rivera-Luna years before Diaz personally met him. See Dec. 3, 2025 Tr. 59:1-62:11, 67:1-93:8; Apr. 7, 2026 Tr. 34:1-38:18.

Diaz's prior expert testimony demonstrates that the danger is concrete, not hypothetical. In the June 2013 trial of other defendants in this prosecution, Diaz described his expert assignment as explaining MS-13's operation in Central America and the United States, its rules, and its structure. Yet, while saying he did not know the indictment or the defendants' charges, he proceeded to identify specific alleged leaders - including "Viejo Santos" - and to repeat case-specific conclusions drawn from police investigations and information supplied by others. June 20, 2013 Tr. 7:13-8:20, 9:9-10:12. That is exactly the kind of role blending that would unfairly bolster his identity testimony at the third trial.

The Court should exclude the expert component of Diaz's testimony. Dividing the testimony into two appearances, taking Diaz off the stand, or recalling him under a different label would not cure the prejudice. Those devices may tell the jury which role Diaz occupies at a particular moment, but they cannot make the jury forget that the person asking to be believed about the decisive identification has also been presented to it as an expert on the very gang,

prison system, aliases, hierarchy, and records through which the Government seeks to prove that identification.

## II. BACKGROUND

### A. Diaz's Central Fact-Witness Role in the Two Rivera-Luna Trials

Diaz testified in both the December 2025 and April 2026 trials. He told the juries that he had worked for the National Civil Police of El Salvador for approximately twenty-five years as an investigator and analyst, principally investigating MS-13 and 18th Street; that he had interviewed hundreds of MS-13 members; and that he now lives in the United States and performs consulting work for the FBI. Dec. 3, 2025 Tr. 57:8-58:20; Apr. 7, 2026 Tr. 28:22-31:25.

His central factual assertion was that Moises Humberto Rivera-Luna and Viejo Santos are the same person. In December, Diaz said he met Rivera-Luna two or three times at the Zacatecoluca prison for "professional interviews," each lasting approximately fifteen to twenty minutes. He said the meetings were not recorded, that he addressed Rivera-Luna by both his legal name and Viejo Santos, and that Rivera-Luna identified that as his nickname. Dec. 3, 2025 Tr. 59:1-61:3. He then made an in-court identification and identified a prison-database photograph and later tattoo photographs as Rivera-Luna. Id. at 62:1-11, 64:8-66:19.

On cross-examination, the limits of that memory became apparent. Diaz first placed the personal meetings in 2013, 2014, or 2015. Id. at 71:14-19. His account of earlier source identifications moved among 2003 or 2004, 2005 through 2008, 2008 through 2010, and 2010 through 2014. Id. at 74:1-91:14. He could not identify the first prison source by legal name or gang name. Id. at 74:1-25. Other asserted sources included a deceased person known as Snoopy, an unidentified Normandy prisoner, a Jollas prisoner, and unidentified custodial personnel. Id. at 77:21-80:12, 87:14-89:22.

Diaz further acknowledged that incarcerated sources sometimes sought benefits, and that prosecutors or other officials decided whether to provide an opportunity. Id. at 83:7-86:2. Most importantly, he explained that police already had identified Rivera-Luna in 2003 or 2004; later photographs were shown to sources "just to confirm, not to identify." Id. at 89:1-7. The distinction is critical because it reveals a feedback loop: the police conclusion supplied the photograph, later sources were asked to confirm it, and those confirmations became support for the original police conclusion.

At the April trial, Diaz repeated that he conducted two or three interviews in 2013 and 2014, but later added 2015; that Rivera-Luna did not want to cooperate; and that the interviews occurred in a makeshift office and were not recorded. Apr. 7, 2026 Tr. 34:1-37:9, 49:10-51:21. He said he asked Rivera-Luna for his gang name and remembered an answer of Viejo Santos or Santos. Id. at 37:1-9.

The Government itself elicited the absence of the contemporaneous documentation. Diaz testified that reports accompanied the interviews, but that he did not have them; that they possibly no longer existed because materials were destroyed when units changed; and that it had not been possible to find them. Id. at 37:10-38:1. On cross-examination, he confirmed that he did not provide the reports to American law enforcement. Id. at 50:19-25. The jury therefore heard an identification based on memory more than a decade after short, unrecorded meetings, without the reports Diaz said were created.

Even though Diaz was presented as a fact witness in those trials, the Government repeatedly elicited opinions resting on specialized police experience. Diaz described MS-13's three-level hierarchy; prison cell-phone practices; inmate money systems; the meaning of graffiti, hand signs, and tattoos; and what the tattoos supposedly established about membership in MS-13 and the Normandy clique. Id. at 30:21-32:15, 38:15-43:2. On cross-examination, after

acknowledging that he never found a phone on Rivera-Luna, Diaz invoked "our investigation" to explain how phones circulated in Rivera-Luna's prison sector. Id. at 45:14-46:23. On redirect, he offered more general opinions about family members and even guards bringing money into prison, and repeated investigative information that Rivera-Luna had sought to establish La Hermandad. Id. at 52:4-53:25. No line told the jury when fact testimony ended and expert opinion began.

**B. Diaz's Prior Expert Testimony Shows the Proposed Scope and Its Case-Specific Drift**

The supplied June 20, 2013 transcript is the clearest preview of the proposed expert role. Diaz stated:

> What I was called to testify about here was as an expert on the criminal organization of MS-13 and how they work or operate in Central America, how they originated in California and operate in the U.S. I am here to testify about their rules and their structure.

June 20, 2013 Tr. 8:16-20.

The testimony revealed that his opinions were not confined to neutral background. Diaz said that "conclusions" had been reached from unspecified information about program leaders who allegedly ran United States programs from El Salvador. He then named Viejo Santos, Enano, and Pando as leaders tied to Washington, D.C., Virginia, and Maryland. Id. at 9:9-10:12. Regarding Pando, Diaz conceded that the investigation was not closed and that police could not say the conclusion was definitive, but he still presented the person as leading the Normandie clique from El Salvador. Id. at 10:2-12.

Diaz identified the sources of his general knowledge as books, writings, and notebooks recovered during prison and street searches; courses in the United States; information shared between Salvadoran and American investigators; and a rulebook examined during a North Carolina case. Id. at 11:20-14:13. He said the North Carolina rules applied "precisely" to MS-13 in Washington, D.C., while also admitting that rules change over time, expressions vary, cliques

differ in strength and territory, and practices can depend on the clique. Id. at 14:10-15:3, 32:11-24, 37:16-22.

His testimony also moved readily from general background into inflammatory and case-specific assertions. He described children becoming killers, black-magic or devil-related practices, automatic rules to kill rivals, and punishment by death. Id. at 29:10-35:11. When shown particular photographs, he opined that the depicted people were leaders, coordinated groups in the United States, issued orders, and had committed or ordered violent crimes. Id. at 27:1-29:9. Those opinions were introduced as products of "our investigations," not through an identified method for testing each source or distinguishing verified facts from police intelligence. Diaz also testified that he did not know the indictment, was not familiar with the charges, and could not connect his testimony to the charged case. Id. at 7:13-8:15. Yet within minutes, his expert narrative identified alleged leaders connected to the Washington area, including Viejo Santos. Id. at 9:9-10:12. That prior performance shows why a label alone cannot keep fact, intelligence, and expertise separate.

**C. The Proposed Expert Subjects Overlap the Central Disputed Facts**

Diaz's fact testimony and his proposed expert subject matter share the same core: who Viejo Santos is; whether that person is Rivera-Luna; whether he belonged to the Normandy clique; whether he was a leader; whether he established or directed La Hermandad; what particular tattoos, photographs, or records mean; and how a Salvadoran prisoner could communicate with or receive support from persons in the United States.

This is not a situation in which an expert explains an unrelated technical subject after giving a few historical facts. Every general proposition Diaz may offer - that prison leaders direct United States cliques, that aliases identify unique gang figures, that tattoos prove clique affiliation, that contraband phones circulate, or that money passes through relatives and guards -

can be used to strengthen his own disputed account of Rivera-Luna. The jury would have no practical way to separate Diaz the witness who asks to be believed from Diaz the expert whose title suggests that belief is professionally validated.

## III. LEGAL STANDARD

A motion in limine seeks to exclude anticipated prejudicial evidence before it is offered at trial. *United States v. Phillips*, 146 F. Supp. 3d 837, 841 (E.D. Mich. 2015). District courts may rule on motions in limine under their inherent authority to manage trials. *Id*. Courts use motions in limine to narrow trial issues, minimize disruptions, and ensure fair and efficient trial management. *Id.*

Rule 403 permits exclusion of relevant evidence when its probative value is substantially outweighed by dangers including unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or cumulative presentation.

Rule 701 permits lay opinion testimony only if it is rationally based on the witness's perception, helpful to understanding the testimony or determining a fact in issue, and not based on scientific, technical, or other specialized knowledge. *United States v. Lloyd*, 807 F.3d 1128, 1154 (9th Cir. 2015). The line between lay and expert opinion matters because Rule 701 is designed to prevent a party from conferring an expert "aura" on a lay witness without satisfying Rule 702. *United States v. Evans*, 175 F.4th 443, 452 (3d Cir. 2026).

Rule 702 governs expert testimony and requires that the proposed expert be qualified and that the testimony be relevant and reliable. The trial court performs a gatekeeping role by evaluating proposed expert testimony for reliability and relevance before the jury hears it. *United States v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002).

In a criminal case, expert disclosures must identify the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications. *United States v. Smith*, 701 F.3d

1002, 1007 (4th Cir. 2012). The purpose of the expert-disclosure requirement is to minimize surprise and provide a fair opportunity to test expert testimony through focused cross-examination. Smith, 701 F.3d at 1007. A disclosure that merely lists topics is inadequate because the disclosure must summarize what the expert will actually say about those topics. *United States v. Williams*, 900 F.3d 486, 489 (7th Cir. 2018).

## IV. ARGUMENT

### A. Designating Diaz as an Expert Would Improperly Bolster the Government's Most Important and Most Disputed Fact Testimony.

The D.C. Circuit has recognized the special risk created when a witness testifies in both lay and expert capacities on closely related subjects. *United States v. Williams*, 827 F.3d 1134, 1160 (D.C. Cir. 2016). In that setting, interspersed lay and expert opinions may require jurors to perform "mental gymnastics" to determine when the witness is speaking as an expert and when he is not. Id. That same risk may lead the jury to assume that all of the witness's opinion testimony rests on expertise rather than personal perception. Id.

Those concerns apply with exceptional force here. Diaz's fact testimony is not peripheral. The Government uses him to make the decisive identification: that Rivera-Luna is Viejo Santos. That assertion is based on old, short, unrecorded meetings and on a memory that cannot be compared with the reports Diaz said were created. If the same witness is then designated as an expert on the gang, the prison, the hierarchy, the aliases, and the tattoos, the jury may credit his factual recollection because of his expert status rather than because the Government proved the recollection reliable.

An expert designation carries an institutional message. Before an expert may testify, the Court must permit the witness to occupy a role associated with specialized knowledge and opinions beyond ordinary experience. A juror who then decides whether to believe Diaz's

unrecorded recollection will not encounter Diaz as an ordinary fact witness. The juror will encounter the Government's MS-13 expert - a former Salvadoran officer presented as specially knowledgeable about the organization, its prisons, its members, its aliases, and its leadership. That status gives Diaz's personal identification a credibility enhancement that no cross-examination can fully separate from the merits of his recollection.

The risk is compounded by the manner in which Diaz testified in April. He moved without warning from an asserted personal memory to general prison practices, from a photograph in a prison database to an identity conclusion, from tattoos to a conclusion of membership in MS-13 and the Normandy clique, and from the absence of a phone on Rivera-Luna to an investigative explanation of how phones moved through his sector. Apr. 7, 2026 Tr. 36:17-43:2, 45:14-46:23. Those transitions already required the jury to guess which hat Diaz was wearing. Formally designating him as an expert would magnify that confusion.

The 2013 testimony demonstrates the same pattern. Diaz moved from general expertise about MS-13 to naming Viejo Santos and other alleged leaders and describing conclusions of continuing investigations. June 20, 2013 Tr. 9:9-10:12. A jury in this case could easily understand those conclusions as an expert endorsement of the Government's entire identity theory.

That prejudice is not merely theoretical. Courts applying the D.C. Circuit's reasoning have recognized that a "two-hatted" witness providing closely related lay and expert opinions presents special risks because of the "aura of special reliability and trustworthiness" associated with expert testimony. *Phoenix Restoration Grp., Inc. v. Liberty Mut. Grp. Inc.*, No. 18-2121 (BAH), 2020 U.S. Dist. LEXIS 22434, at *10 (D.D.C. Feb. 10, 2020). Here, that aura would attach to the exact witness whose unsupported memory supplies the Government's direct bridge between Rivera-Luna and Viejo Santos. Excluding Diaz's expert component is therefore necessary to preserve the jury's independent assessment of his fact testimony.

**B. Presenting Diaz at Two Different Times Would Not Cure the Credibility Transfer Created by His Expert Status.**

The Government may propose to separate Diaz's testimony into two appearances - one as a fact witness and one as an expert - or to remove him from the stand and recall him in the other capacity. That proposal addresses only the easiest form of role confusion: whether the jury knows which label applies to a particular answer. It does not address the more serious prejudice presented here: the jury's assessment of the person giving the answers. Diaz remains the same witness, and the expert imprimatur remains part of the jury's evaluation of his credibility throughout the trial.

The order of the two appearances makes no difference. If Diaz testifies as an expert first, the jury will hear his later factual identification through the lens of the specialized authority the Government has already assigned to him. If Diaz testifies as a fact witness first and is later recalled as an expert, the later designation retroactively validates the earlier identification and leaves the jury with the impression that the witness who made that identification has now been confirmed as an authority on the subjects necessary to understand it. A recess, a change in the

sequence of questions, or a second oath cannot cause jurors to erase what they know about the witness.

Nor are the two subjects genuinely independent. Diaz would be asked as an expert about the same MS-13 organization, Salvadoran prison environment, gang aliases, clique hierarchy, tattoos, communications, and leadership structure that surround his personal claim that Rivera-Luna acknowledged being Viejo Santos. His expert testimony would thus function as implicit corroboration even if the prosecutor never asks the ultimate question, "Is Rivera-Luna Viejo Santos?" The jury could reasonably infer that Diaz's expert knowledge is why his factual identification should be trusted.

*Williams* identifies the danger that jurors may assume a dual-role witness's opinions rest on expertise rather than personal perception. 827 F.3d at 1160. That danger is not confined to interspersed questioning. Separating the appearances may clarify the source claimed for each answer, but it cannot prevent expert authority from enhancing the witness's overall credibility. Because identity is the central contested issue and Diaz is the only law-enforcement witness claiming a personal admission, the resulting prejudice is not collateral; it bears directly on the jury's verdict.

**C. The Proposed Testimony Blurs the Boundary Between Lay Testimony Under Rule 701 and Expert Testimony Under Rule 702.**

Rule 701 requires lay opinion testimony to be based on the witness's perception and not on scientific, technical, or other specialized knowledge. *United States v. Lloyd*, 807 F.3d 1128, 1154 (9th Cir. 2015). A lay witness may not offer an opinion based on information outside what the witness perceived or on reasoning beyond the witness's permitted lay capacity. *United States v. Evans*, 175 F.4th 443, 452 (3d Cir. 2026).

The boundary can be stated concretely here. Diaz's claim that he sat in a room with Rivera-Luna and heard particular words is offered as fact testimony. His conclusions about gang rank, hierarchy, territorial graffiti, tattoo meaning, transnational programs, prison money systems, phone circulation, and the identity or uniqueness of an alias arise from specialized police work, interviews, intelligence, training, and materials gathered by others. Those are expert subjects governed by Rule 702.

The Government should not be permitted to use the expert role to complete or strengthen the fact account. Diaz should not be allowed, as an expert, to opine that Rivera-Luna is Viejo Santos; that Rivera-Luna was a ranflero, leader, or coordinator; that he created or directed La Hermandad; that his silence, demeanor, or alleged refusal to cooperate proved gang allegiance; that particular prison or police records correctly identified him; or that case-specific photographs and tattoos establish the charged identity. Each proposed conclusion either repeats the disputed fact testimony or supplies expert force to a factual issue the jury must decide from admissible evidence.

Nor should Diaz be permitted to narrate what "we learned," what "our investigation" established, or what unnamed prisoners, custodial personnel, investigators, databases, books, notebooks, or training partners concluded about Rivera-Luna. His earlier testimony shows that such information forms a substantial part of his asserted knowledge. June 20, 2013 Tr. 9:9-14:13; Dec. 3, 2025 Tr. 74:1-91:14. The expert label would turn an accumulation of out-of-court information into a case narrative that appears to carry professional validation.

The Court should not allow the Government to shift between these roles without clear limits. Rule 701's limitation exists to prevent a party from presenting expert testimony in lay-witness form. *United States v. Evans*, 175 F.4th 443, 452 (3d Cir. 2026). If Diaz's opinions depend on specialized knowledge, the Government must satisfy Rule 702 and the applicable disclosure

requirements. Even when those threshold requirements are met, however, Rule 403 independently requires exclusion where the expert role unfairly bolsters the same witness's decisive fact testimony.

In this case, a reliable method does not exist for translating Diaz's broad experience into the proposed case-specific conclusions. In 2013, Diaz referred generally to conclusions from information, interviews, police investigations, seized writings, and training. He acknowledged changes across time, places, and cliques. June 20, 2013 Tr. 9:9-14:24, 32:11-24, 37:16-22. He did not explain a consistent procedure for evaluating source motives, testing accuracy, separating intelligence from verified fact, or avoiding the circular confirmation process described in his December testimony. Experience may qualify a witness to explain a subject; it does not automatically make every investigative conclusion reliable.

**D. Rule 403 Requires Exclusion Because the Government's Need for Diaz as an Expert Is Outweighed by the Danger of Unfair Bolstering and Jury Confusion.**

Rule 403 permits exclusion when probative value is substantially outweighed by unfair prejudice, confusion, or misleading the jury.

The marginal value of using Diaz in both roles is low. The Government can elicit admissible personal observations from Diaz without calling him an expert. It can present any genuinely necessary general gang background through Raymond Betts, a witness whose credibility is not also the central disputed identity issue. In the prior trials, the Government had extensive testimony from cooperating witnesses and from American law-enforcement witnesses concerning MS-13's terminology, structure, communications, tattoos, and practices. Diaz's expert overlay is therefore cumulative where it is general and prejudicial where it is case-specific.

The prejudice is substantial. The jury may believe Diaz's decade-old memory because an expert designation suggests special reliability. It may treat his professional conclusions as corroboration

of facts that rest on unidentified sources. It may assume that his knowledge of Salvadoran prisons validates prison and police records whose accuracy and admissibility remain contested. It may also confuse a general proposition about some MS-13 members with proof that Rivera-Luna committed or directed any charged act.

The danger of unfair emotional impact is also apparent from the 2013 testimony, which included children being trained to kill, devil-related practices, automatic rules to kill rivals, and death as punishment for disobedience. June 20, 2013 Tr. 29:10-35:11. Such broad descriptions may be powerful, but their force does not establish that Rivera-Luna is Viejo Santos or that he committed the charged conduct. When delivered by the same witness who points to Rivera-Luna in the courtroom, the testimony risks guilt by association and misleading use of expert authority. The prejudice cannot be eliminated by presenting Diaz in two phases or recalling him after another witness. Those procedures do not change the jurors' knowledge that Diaz is the Government's chosen expert, and they do not prevent that status from validating his disputed factual identification. The Court should therefore exclude the proposed expert testimony from Diaz. *See United States v. Williams*, 827 F.3d 1134, 1160 (D.C. Cir. 2016).

## V. CONCLUSION AND REQUESTED RELIEF

For these reasons, Defendant Moises Humberto Rivera-Luna respectfully requests that the Court grant this motion and exclude the expert component of Juan Diaz's proposed testimony. Diaz should be limited to admissible fact testimony based on his personal perception, subject to ordinary evidentiary objections.

Exclusion is required because changing the order of testimony, separating the examinations, or recalling Diaz cannot remove the expert imprimatur from the jury's assessment of his factual identification. The Government remains free to elicit admissible personal observations from Diaz and to present any genuinely necessary expert background through a

different, properly disclosed witness whose expert status will not bolster the central contested identification.

Respectfully submitted,

Alfred Guillaume

**Alfred Guillaume III, #MD0085**
Law Offices of Alfred Guillaume III
1350 Connecticut Ave. NW, #308
Washington, D.C. 20036
**Counsel for Defendant Moises Humberto Rivera-Luna**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 5th day of September 2026, a copy of the foregoing Motion in Limine was served electronically on all parties of record, including the Office of the United States Attorney for the District of Columbia.

**Alfred Guillaume III**
**Counsel for Defendant Moises Humberto Rivera-Luna**